Leland R. CHALMERS, Plaintiff,

v.

The QUAKER OATS COMPANY, Quaker Officers' Severance Program and Robert Penzkover and Robert Montgomery as Members of the Severance Program Committee, Defendants.

No. 93 C 349.

United States District Court,
N.D. Illinois,
Eastern Division.

July 8, 1994.

Leon E. Lindenbaum, Lindenbaum, Coffman, Kurlander, Brisky & Hayes, Ltd., Chicago, IL, for plaintiff.

Michael James Sheehan, Martin Harris, Connelly, Sheehan & Moran, Chicago, IL, for defendants.

## MEMORANDUM AND ORDER

LINDBERG, District Judge.

Plaintiff, Leland R. Chalmers ("Chalmers"), has filed an Employee Retirement Income Security Act ("ERISA") action to review defendants' denial of his severance benefits. Chalmers was terminated from his position as Vice President in charge of Quaker's Tax Department for violating the company's policy against sexual harassment. The Severance Program Committee ("Committee"), which administers the Quaker Officers' Severance Program, concluded that Chalmers' behavior constituted "gross misconduct" disqualifying him from receiving severance benefits under the ERISA employee benefits plan.

Quaker has a company policy against sexual harassment which is independent of federal law and attempts to foster a work environment where men and women behave respectfully towards each other. Quaker's policy on sexual harassment provides as follows:

> Providing a working environment which is free from intimidation is a fundamental Quaker policy. All supervisory personnel are responsible for assuring such an environment, including the absence of conduct that may be defined as sexual harassment.

> Sexual harassment is defined to include: unwelcome sexual advances; request for sexual favors; and other verbal or physical conduct of a sexual nature when such conduct is made explicitly or impliedly a term or condition of employment, is used as a basis for employment decisions, or has the purpose or effect of interfering with work

performance or creating an otherwise offensive working environment. The Company will not condone such conduct by an employee or agent.

Any employee who is subjected to or aware of such harassment or intimidation is urged to bring such action promptly to the attention of their Personnel Representative or the Affirmative Action Department. All such complaints will be treated in the strictest confidence and will be promptly investigated. Where violations are confirmed, disciplinary action will be taken.

The Company's policy on this subject is to be communicated to all employees.

(Plaintiff's Exhibit 4; signed by Chief Executive Officer William D. Smithburg and dated February 1990). CEO Smithburg and Philip A. Marineau, then Executive Vice President of U.S. Grocery Products, sent a subsequent notice to all employees on November 26, 1991 which further addressed Quakers' policy on sexual harassment:

> Recent widely publicized sexual harassment allegations and subsequent televised hearings may have raised some questions in your mind about *Quaker's* sexual harassment policy. We want you to know our long standing position and policy on this sensitive subject. We also want you to know what you can do, and what process you can expect, if you believe you or co-workers are experiencing harassment.
>
> Quaker's position has always been that sexual harassment is illegal, against company policy, and will not be tolerated. We expect a working environment where people are respected and encouraged to be productive. In this respect harassment of any nature is inappropriate. However, for purposes of a definition which reflects the law and Quaker's policy, sexual harassment includes: unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature, when it is a term or condition of employment, or when such conduct creates a hostile working environment.
>
> At Quaker, harassment complaints may be taken to any member of management or any Human Resources professional, regardless of level or organization. We take this unusual position because we want employees who feel they are being harassed to be comfortable discussing this personal and difficult subject.
>
> Investigations of sexual harassment allegations take place on a very confidential basis. This is for the protection of both the complainant and the alleged harasser. To assure consistency and fairness of process and discipline, the Corporate Affirmative Action Department is included in all complaint and investigation assessments....

(Plaintiff's Exhibit 3). An additional policy manual, entitled "Information About Sexual Harassment—Quaker's Policy and Complaint Process," provides that:

> in addition to physical or other explicit sexual conduct or language, our policy covers jokes of a sexual nature, "pinups", sexual stories, etc.

(Plaintiff's Exhibit 4).

In February of 1988, Karen Brady complained to Douglas Ralston, Quaker's Senior Vice–President Corporate Human Resources, that plaintiff had made sexually offensive comments to her on several occasions. Brady was a tax attorney and had worked for Chalmers for approximately two and a half years in the Tax Department. Chalmers allegedly commented "nice melons" to Brady while standing by a salad bar, told her it would be more interesting to be a gynecologist than a tax attorney, advised her to wear more feminine clothing and stated his concern that she not scream out confidential information about Quaker deals while in the throes of ecstasy with her husband.

Ralston met with Brady on February 9, 15 and 18, 1988. Ralston subsequently met with Chalmers to discuss Brady's allegations. Chalmers admitted to making the "nice melons" and "throes of ecstasy" comments, which he referred to as "boy talk."

As part of an investigation into Brady's allegations, Ralston interviewed several other employees in the Tax Department including Dan Orzechowksi, Cathy Abrahamian, Lisa Kelly, George Pappas, Carla Berg and Anne Vogel. Lisa Kelly, a secretary in the Tax Department, informed Ralston that when she

refused Chalmers' invitation to dance during a Star of Chicago cruise, Chalmers picked her up, threw her over his shoulder and carried her onto the dance floor. When Carla Berg concluded a presentation for Chalmers, he allegedly commented on her "nice backside." Chalmers allegedly referred to Arden Organics, a business purchased by Quaker, as "Arden Orgasmics" during a meeting where several female employees were present. Chalmers also met George Pappas' date at a Quaker function and asked her if she liked dating fat boys. Chalmers then asked Pappas if he liked to date "fat girls who put out." Pappas' date reportedly told Chalmers to be quiet unless he wanted to get "slapped with a sexual harassment suit."

Dan Orzechowski and Randy Olson reported to Ralston that Chalmers strongly indicated his displeasure with them for reporting to Human Resources that one of Chalmers' employees, Steve Vranek, was sexually harassing another employee. Department members were also aware of a conversation between Chalmers and Vranek at the time Vranek was terminated wherein Vranek allegedly stated: "Why am I being fired when you are worse than me [in harassing women]?" Chalmers allegedly responded: "Yes, but I didn't touch anyone."

Ralston and other members of the Human Resources Department were consistently told that women in the Tax Department were afraid to report incidents of sexual harassment because Chalmers did not take the issue seriously and because they feared retaliation by Chalmers even if the incidents did not involve him. Chalmers' secretary, Cathy Abrahamian, reported that "many women [are] offended by [Chalmers] but all are afraid to say anything for fear of their jobs." Brady was reportedly so afraid of Chalmers that she asked Ralston not to discuss her allegations with him until after she left Quaker.

As a result of the investigation, Quaker paid Karen Brady $30,000 to settle her threatened sexual harassment claim. On April 25, 1988, Larry Baytos, then Senior Vice President of Human Resources, addressed the entire Tax Department on Quaker's sexual harassment policy. As an additional follow-up to the Brady matter, Quaker held affirmative action and sexual harassment training sessions for the Tax Department on June 7, 1988 and June 20, 1988. Chalmers was required to attend the seminars and was warned by his supervisor, Mike Callahan, that any similar incidents would result in severe disciplinary action such as termination. Chalmers' bonus was also reduced as a further disciplinary measure.

Despite the training sessions and warning about future disciplinary action, Chalmers kissed Anna Raisor, executive assistant to Terry Westbrook, at work on August 20, 1992. Chalmers kissed Raisor on the cheek when she returned a document to him during working hours in or around the hallway outside Chalmers' office. Raisor was assisting Chalmers in meeting deadlines on certain performance reviews and reports for Westbrook while Chalmers' secretary was on vacation.

Chalmers had criticized her earlier that day for work done on a salary report and for a phone message she delivered. Chalmers had also lost his temper with Raisor when she interrupted a meeting in his office to obtain his signature on a performance review of Dan Orzechowski. According to Chalmers, Westbrook had insisted on a minor change which required the review to be retyped and resigned. Raisor apparently informed Chalmers that Westbrook would not sign the performance review without signatures from Chalmers and Orzechowski. Chalmers was rankled by Westbrook's insistence that the review be completed that day when Westbrook knew that Orzechowski was out-of-town and could not sign the revised document. Chalmers ultimately signed the performance review for both himself and Orzechowski.

On August 25, 1992, Raisor told Douglas Ralston about the kissing incident. She characterized Chalmers' behavior as "inappropriate, shocking and repulsive." Ralston began an investigation into the incident. That same day Ralston advised Angela Hill, manager of Corporate Human Resources, about Raisor's complaint. Hill then informed Ralston of a recent incident between Chal-

mers and her subordinate, Nancy Kolinski. According to Kolinski, Chalmers took her hand, asked her to feel how warm it was and then commented that a "warm hand means a warm heart regardless of what people say about me." Hill further reported that Kolinski had not complained about the incident; she just thought Chalmers was "weird."

As part of his investigation into Raisor's allegations, Ralston contacted former Quaker employee Mike Callahan on August 28, 1992 to determine what warning he had given Chalmers following the sexual harassment complaint by Karen Brady. According to Ralston's notes of the conversation, Callahan advised Ralston that he had made Chalmers aware of the seriousness of the situation and the consequences of a repeat offense. (Plaintiff's Exhibit 15).

On August 31, 1992, Ralston and Joan Green, Quaker's Director of Affirmative Action, met with Chalmers to present and discuss Raisor's allegations. In response to Chalmers' request to present additional facts, they met again on September 1, 1992. Chalmers told Ralston and Green that he had given Raisor tickets to a Ravinia concert one week prior to the incident. Chalmers informed them that Raisor had thanked him profusely a few days later because the concert had provided her with an emotional escape from a recent death in the family. Chalmers explained that he made an emotional connection with Raisor because of this conversation and that his brief kiss on Raisor's cheek was merely a gesture of appreciation for her efforts and an apology for his earlier loss of temper that day. Chalmers informed Ralston and Green that he was shocked by Raisor's reaction to the kiss, which he equated to a handshake. He also attempted to dismiss the situation by commenting on his "Mediterranean blood."

Joan Green discussed the incident with Raisor on September 2, 1992. Green did not characterize the meeting's purpose as fact-finding but instead to offer support and counseling services to Raisor as Quaker's Director of Affirmative Action. Green's notes of her conference with Raisor state in relevant part:

[Raisor] talked to Doug [Ralston] after a long weekend away. Incident was Thursday, took Friday and Monday off, talked to Doug Ralston on Tuesday. By then was pretty determined & knew what wanted to say.

—[Raisor] has heard [Chalmers] say negative things to women over time. For example, 'liked it better when you guys were in the kitchen.' Not anything particularly sexual.

—That day she was trying to help him—he was mean and out of line and yelling—kiss was maybe trying to make up for the whole day.

—Don't think things are out of hand now—don't want to see him—he's avoiding her too—

(Plaintiff's Exhibit 50).

Sometime between August 25 and September 11, 1992, Ralston discussed Chalmers' situation with Robert Montgomery, Vice President Human Resources U.S. Grocery Products, pursuant to their routine practice as members of the Severance Program Committee. Montgomery told Ralston that he believed that when Ralston had completed his investigation, Ralston would conclude that Chalmers' employment would have to be terminated and his severance benefits denied.

Between September 1 and September 11, 1992, Ralston and Westbrook (Chalmers' immediate superior) jointly decided to terminate Chalmers' employment for violating Quaker's policy against sexual harassment. Ralston also determined that Chalmers would not be given severance pay as the incidents constituted gross misconduct. Prior to implementing the decision to terminate Chalmers, Ralston and Westbrook informed CEO Smithburg and Luther McKinney, Senior Vice President Law, Corporate Affairs and Corporate Secretary, to give them an opportunity to offer input into the decision-making process if they so desired.

On or about September 11, 1992, Ralston told Montgomery that Chalmers was being terminated without severance pay due to the Raisor incident and the 1988 incidents and warning by Callahan. That same day Ral-

ston and Westbrook met with Chalmers and informed him of the decision to discharge him, effective immediately, with no severance benefits.[1]

Ralston's notes of the termination meeting with Chalmers on September 11, 1992 state in relevant part:

> ... informed Lee—investigation completed—decision is that he will be terminated—his actions with Anna are sufficient reasons for term. (uninvited, offensive)—but in addition the Brady situation (creation of offensive and intimidating environment) was also grounds for term. but we chose to discipline him and warn him—combination of 2 incidents resulted in decision to term.
>
>     \*     \*     \*     \*     \*     \*
>
> —told him term. was for cause—(he had asked something about severance pay cont)."

Shortly after September 11, 1992, Ralston advised Montgomery of his termination conference with Chalmers. Ralston advised Robert Penzkover, Quaker's Director of Employee Benefits, sometime prior to September 16, 1992 that he had terminated Chalmers for sexual harassment.

Ralston sent Chalmers a letter, dated September 25, 1992, confirming that his severance benefits were being denied under the plan. Enclosed with the letter were copies of his personnel file, including documents relating to the 1988 and 1992 investigations. The letter stated in pertinent part:

> Gross misconduct, including actions or behavior which constitute sexual harassment, renders an employee ineligible for any separation allowance at the time of termination. The procedure for an appeal of a denial of severance benefits is set forth in the Quaker Officers' Severance Program.

On November 6, 1992, Chalmers appealed the initial denial of severance benefits and requested that the Committee review said decision. Shortly after receiving a copy of Chalmers' appeal letter, Ralston consulted with Quaker's Law Department and recused himself from the Committee due to the fact that he had conducted the investigation and made the findings which the Committee would have to review. Ralston recommended Robert Penzkover as his replacement on the Committee for purposes of deciding Chalmers' appeal. CEO Smithburg approved this substitution.

The Committee met on November 23, 1992 and again on November 24, 1992 to consider Chalmers' appeal. Prior to the Committee meetings, Quaker's Law Department provided Montgomery and Penzkover with the initial denial letter written by Ralston, Chalmers' appeal letter, documents from Ralston's investigation file which the Law Department had obtained from Ralston, the Quaker Officers' Severance Program and Quaker's sexual harassment policy statements.[2] The record before the Committee consisted of these documents, plus whatever knowledge Montgomery and Penzkover independently had regarding the relevant facts and circumstances.

The documents furnished to the Committee did not include Green's notes of her September 2, 1992 meeting with Raisor (plaintiff's exhibit 50) or Ralston's notes of his termination conference with Chalmers (plaintiff's exhibit 10). Ralston testified that he did not turn over the notes of his exit interview with Chalmers to the Law Department. A witness from the Law Department also testified that a number of documents relating to employee complaints against Chalmers were purposely withheld from the Committee because the employees' state-

---

1. Under Paragraph 4 of the Severance Program, an officer who qualifies for severance benefits receives the following: (a) one year of fully-paid salary, at the rate he was receiving at the time of termination; (b) an amount equal to the average of his last two incentive bonuses; and (c) certain welfare benefits, such as medical and life insurance, for one year. Plaintiff's salary at the time of termination was $175,600.00. The average of Plaintiff's last two bonuses was $65,000.00. The value of the welfare benefits for one year would be $4,837.00. The total value of the entire severance package to Plaintiff would have been $245,-437.00.

2. The documents before the Committee included Plaintiff's Exhibits 1, 3, 4, 5, 7, 11, 12, 15–29 and 31–36.

ments had been made in confidence. (Defendants' Exhibits 4–8).

At the conclusion of the November 24, 1992 meeting, the Committee voted to deny Chalmers' appeal. Shortly after the conclusion of the Committee meetings, Montgomery and Penzkover gave copies of their notes to Quaker's Law Department and requested that counsel draft a decision letter. Quaker's outside counsel drafted a denial letter for the Committee and transmitted it to the Committee with a cover letter.

The draft denial letter referred to the Kolinski incident as follows:

> Finally, while investigating the incident with Ms. Raisor, we learned that Mr. Chalmers may have had another physical encounter with another female employee, Nancy Kolinski. He allegedly took her hand in his, asked her to feel how warm it is, then commented that a warm hand is a sign of a warm heart. Ms. Kolinski apparently related this incident to at least one other woman, Angie Hill, who reported it to the human resources department. The Committee does not assign much weight to this allegation, since it comes from a secondhand source. It, nonetheless, reinforces our conclusions regarding Mr. Chalmers' lack of respect for a woman's physical integrity or right to privacy.

On December 2, 1992, Penzkover personally interviewed Kolinski, an employee in Human Resources. Later that day the draft denial letter was revised and signed. The final denial letter revised the section relating to Kolinski to read as follows:

> Finally, while investigating the incident with Ms. Raisor, we learned that Mr. Chalmers had another recent physical encounter with another female employee, Nancy Kolinski. He took her hand in his, asked her to feel how warm it was, then commented that a warm hand is a sign of a warm heart. Ms. Kolinski did not like this behavior, felt uncomfortable because of it, and related this incident to Angie Hill, her department manager. This incident reinforces our conclusions regarding Mr. Chalmers' lack of respect for a woman's physical integrity or right to privacy.

(Plaintiff's Exhibit 41). The Committee members also asked that the draft letter be revised to remove any reference to Chalmers' alleged violation of federal law. The Committee indicated that their decision had been predicated on Chalmers' violation of Quaker's sexual harassment policy and not federal harassment law, with which they as laymen were not intimately familiar. The final draft set forth the Committee's decision to deny Chalmers' appeal as follows:

> Mr. Chalmers was fired for committing sexual harassment by creating a sexually hostile work environment. This environment resulted from years of inappropriate behavior by Mr. Chalmers, which culminated in the incident when he kissed Anna Raisor at the office on August 20, 1992. We firmly believe that violating the company policy against sexual harassment constitutes 'gross misconduct' under Section 3(a)(1) of the Severance Program, especially when, as here, the offense includes physical contact and is committed by a corporate officer and continues over a period of years despite warnings and training and where the Company policy addresses a topic sufficiently important that there is a federal law on the same subject.

(December 2, 1992 denial letter at 1). The denial letter further provided on page 5:

> Our Program, denies eligibility whenever an employee is terminated for gross misconduct—i.e., when gross misconduct is the reason given by Quaker, in good faith, for the employee's termination. Section 3(a)(1). We interpret this provision as dictating denial whenever Quaker terminates an employee based on its good faith belief that he committed gross misconduct. Based on the evidence discussed above, all of which was available to Mr. Ralston when he recommended discharge, we expressly find that he had such a good faith belief. However, we note that even if we were required to reach a decision on the merits, based on a preponderance of the evidence, the outcome would not change. The evidence overwhelmingly supports a conclusion that Mr. Chalmers actually committed gross misconduct, and we expressly so find.

The December 2, 1992 letter also provided that Chalmers could treat this letter as his initial denial notice and that March 3, 1993 would then be the deadline for filing his appeal:

[T]he present letter, which resulted from deliberation during a formal Committee meeting, provides the kind of detailed evidentiary discussion and analysis you requested. After reading this letter, please determine whether you would have presented different facts or made additional arguments in your appeal, had the initial denial notice contained all this information and resulted from this process. If you believe your appeal would have been different, then you may treat the present letter as the "initial" notice of denial, and may file an appeal to this Committee responding to the points made herein. You have *until March 3, 1993* to do so.... As indicated earlier, you may file a written request for reconsideration of this decision no later than March 3, 1993, but it is not our practice to allow "face-to-face" presentation of appeals.

(December 2, 1992 denial letter at 3, 4 and 6).

Chalmers rejected Quaker's offer to treat the December 2, 1992 letter as his initial notice of denial of severance benefits. In a December 11, 1992 letter to the Committee, Chalmers' attorney concluded: "In response to the Committee's December 2, 1992 determination, we believe that Mr. Chalmers has exhausted his administrative remedies and may now pursue his claim in federal court." (Plaintiff's Exhibit 42 at 1).

Chalmers timely filed his ERISA action in this court requesting review of the Committee's final decision to deny him severance benefits. Chalmers asks this court to reverse the decision of the Committee and to award him $245,437.00 in severance benefits due under the Quaker Officers' Severance Program.

The Quaker Officers' Severance Program was established by Quaker to attract and retain officers "through assurances of continued compensation and benefits when their employment with [Quaker] is terminated due to certain circumstances beyond their control." (Program, ¶ 1). Under paragraph 3(a)(1) of the Program, a terminated officer is eligible for severance benefits unless he or she was terminated for "gross misconduct."

Paragraph 2(a) provides that the Program shall be administered by the Severance Program Committee, which consists of Quaker's Vice President Corporate Human Resources (Ralston) and Vice President Human Resources U.S. Grocery Products (Montgomery). Paragraph 2(a) authorizes Quaker's Chief Executive Officer (Smithburg) to expand or reduce the number of Committee members and to designate, remove or replace the Committee members.

Paragraph 2(b) further gives the Committee sole responsibility for the administration of the Program and the discretionary authority to "adopt such rules and procedures as it deems necessary, desirable or appropriate." Paragraph 2(c)(1) gives the Committee the power to "construe and interpret the Program, decide all questions of eligibility, and determine the amount, manner and time of any severance benefit hereunder." Finally, paragraph 2(d) provides that any denial of a claim for severance benefits must be in writing and provides for a review or appeal process:

The Committee shall make all determinations as to the right of any person to a benefit under the Program. Any denial by the Committee of the claim for benefits under the Program by an employee shall be stated in writing by the Committee and delivered or mailed to the employee; and such notice shall set forth the specific reasons for the denial. In addition, the Committee shall afford a reasonable opportunity to any employee whose claim for benefits has been denied for a review of the decision denying the claim.

■ . Because the Quaker Officers' Severance Program confers discretion on the Severance Committee which administers it—both in determining an officer's eligibility for benefits and in construing the terms of the plan, the appropriate standard of review is whether the Committee's decision was arbitrary and capricious. *Exbom v. Central States Health and Welfare Fund*, 900 F.2d 1138, 1142 (7th Cir.1990). The arbitrary and

capricious standard provides that the Committee's decision shall not be overturned, "absent special circumstances such as fraud or bad faith, if 'it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome.'" *Exbom* at 1142, quoting *Pokratz v. Jones Dairy Farm*, 771 F.2d 206, 209 (7th Cir.1985).

■ If the plan administrators operate under a conflict of interest, that conflict must be weighed as a factor in determining whether their decision is arbitrary and capricious. *Firestone Tire and Rubber Company v. Bruch*, 489 U.S. 101, 113–15, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989). If a claimant is unable to show that the administrators had a significant conflict of interest, a denial of benefits will be reversed only if the denial was completely unreasonable. The greater the conflict of interest, the less the court defers to a denial of benefits that appears to be wrong. *Van Boxel v. Journal Co. Employees' Pension Trust*, 836 F.2d 1048, 1052–1053 (7th Cir.1987); *Brown v. Blue Cross & Blue Shield of Alabama*, 898 F.2d 1556, 1561–1567 (11th Cir.1990).

Chalmers contends the Committee's decision was wrong and unreasonable regardless of the degree of deference given it. Chalmers does maintain, however, that the Committee's decision should be accorded little deference because Penzkover and Montgomery had a serious conflict of interest given that the Quaker Officers' Severance Program was an unfunded plan under which benefits were paid from the general assets of Quaker; the denial of benefits reviewed by them was the decision of Ralston who was Penzkover's direct supervisor and Montgomery's functional supervisor; they knew it was probable that Smithburg (the CEO), Marineau (the President) and McKinney (the Chief Legal Officer) had also participated in the decision; and Montgomery had advised Ralston to terminate the employment of Chalmers without severance pay before Ralston made such a decision.

Chalmers also contends the Law Department's failure to provide the Committee and Chalmers with plaintiff's exhibits 10 and 50 constituted a breach of Quaker's fiduciary duty [3] under ERISA and operated as a fraud upon Chalmers, again requiring the Committee's decision to be given little deference. According to Chalmers, the Committee's bad faith was affirmatively established by the Committee's deceptive bolstering of the record as it related to the reported Kolinski incident and their refusal to meet with Chalmers.

■ It is Chalmers' position that Quaker's sexual harassment policy mirrors federal law and that hostile-environment sexual harassment requires verbal or physical conduct of a sexual nature which is sufficiently severe or pervasive to alter the conditions of the victim's employment and to create both a subjectively and objectively hostile or abusive work environment. Unless the conduct is quite severe, a single incident or isolated incidents of offensive sexual conduct cannot create a sexually-hostile work environment. See *Brooms v. Regal Tube Co.*, 881 F.2d 412, 418–419 (7th Cir.1989); *Dockter v. Rudolf Wolff Futures, Inc.*, 913 F.2d 456, 459 (7th Cir.1990); *Harris v. Forklift Systems, Inc.*, — U.S. ——, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

Chalmers argues that kissing Raisor's cheek was not conduct of a sexual nature and was insufficiently severe and too isolated an incident to constitute sexual harassment. According to Chalmers, this single act towards Raisor cannot constitute sexual harassment under federal law or Quaker's policy because the record compiled by the Committee contained no evidence that it created a hostile or abusive working environment for Raisor and that no reasonable person would have had such a perception.

Chalmers contends the Committee's decision to deny him severance benefits is unreasonable because the Committee partially based its decision on the February 1988 investigation and the Kolinski incident. Chalmers points out that the Raisor incident is the only conduct relevant to the gross mis-

---

**3.** Chalmers asks this court to find that Quaker acted as a fiduciary within the meaning of ERISA by deciding what documents should be provided to the Committee and Chalmers in connection with the Committee's review of the decision to deny Chalmers his severance benefits.

conduct determination as it was the alleged proximate cause of the termination according to Ralston's notes. Chalmers argues that the Raisor incident did not constitute a pattern of conduct because the prior alleged sexual harassment by Chalmers occurred on or before February 1988, more then four years prior to the Raisor incident, and related solely to his subordinates in the Tax Department; there was no evidence in the record that any sexually-hostile environment continued in the Tax Department subsequent to the sexual harassment training sessions presented by the Human Resources Department in June 1988; Quaker had fully investigated past complaints against Chalmers in 1988 and had determined that they did not merit his termination; Raisor was not a Tax Department employee and Chalmers had no supervisory authority over her; and Chalmers' conduct towards Raisor was a single isolated incident with the objective of apology and gratitude. Assuming arguendo the Raisor incident did violate Quaker's sexual harassment policy, Chalmers maintains it did not constitute "gross misconduct" as the incident alone was not outrageous or flagrantly bad.

Unless the court finds that the Committee members (Montgomery and Penzkover) had a significant conflict of interest, its review under ERISA is rather limited. The court must simply determine that the Committee's interpretation of the plan, its consideration of the issues and evidence and its ultimate decision to deny Chalmers severance benefits were not completely unreasonable.

■ The court determines that Montgomery and Penzkover did not have a conflict of interest due to their being employees of Quaker or because the Quaker Officers' Severance Program was unfunded. ERISA expressly allows employers to maintain unfunded benefit plans. See 29 U.S.C. § 1081(a)(1). ERISA also provides that employers may appoint their own officers to administer ERISA plans even when the corporation is a "party in interest":

> Nothing in [this Act] shall be construed to prohibit any [person] from ... serving as a fiduciary in addition to being an officer, employee, agent or other representative of a party in interest.

29 U.S.C. § 1108(c)(3). Case law has held that because Congress has expressly authorized a corporation to appoint its own officers to administer its ERISA plans, no inherent conflict of interest exists. See *Flinchbaugh v. Chicago Pneumatic Tool Co.*, 531 F.Supp. 110, 113 (W.D.Pa.1982) (it is clear that no inherent conflict exists as ERISA specifically contemplates such an arrangement); *United Mine Workers v. Powhatan Fuel, Inc.*, 828 F.2d 710, 713 (11th Cir.1987) (ERISA specifically allows an officer of a corporation to also serve as a fiduciary of the corporation's ERISA benefit plan, so no inherent conflict of interest exists); *Gaunt v. CSX Transportation, Inc.*, 759 F.Supp. 1313, 1318 (N.D.Ind. 1991) (it does not seem a necessary conclusion that such a conflict exists merely because the administrator's decision saves the plan money or merely because a party in interest's officer or employee serves as a fiduciary).

The fact that Chalmers' severance benefits would have been paid from the general assets of Quaker created no conflict of interest for the Committee. No evidence was elicited to show that Montgomery and Penzkover disregarded the plan's terms or the evidence concerning Chalmers in order to save Quaker money. In fact, both Montgomery and Penzkover credibly testified that they never even contemplated the financial impact of their decision on Quaker.

Montgomery's and Penzkover's testimony is further supported by the fact that the severance benefits to be paid Chalmers ($245,437.00) would have had a negligible impact on Quaker, whose 1992 revenues amounted to 5.7 billion dollars ($5,700,000,-000.00). As the Seventh Circuit noted in *Van Boxel*, 836 F.2d at 1051: "[T]he impact on the company's welfare of granting or denying an individual application for a pension will usually be too slight to compromise the impartiality of the trustees, even if all are appointed by the company. Nor is it in a company's long-run best interest to alienate employees by dealing unfairly with pension claims."

Quaker voluntarily adopted a competitive severance plan in order to attract and retain talented officers. Arbitrarily or capriciously denying severance benefits to officers would undermine the objectives of the Program and would not be in Quaker's long-term best interests. The testimony established that in most cases, the Committee has awarded discharged officers severance benefits under the Program. The court can find no evidence to show that in this and only this instance, Quaker's financial interest caused the Committee to disregard the purpose and express language of the Program.

■ Plaintiff maintains that it is inherently impossible for an ERISA fiduciary to review decisions made by a superior in the corporate hierarchy. *Bender v. Board of Fire & Police Commissioners,* 254 Ill.App.3d 488, 193 Ill.Dec. 890, 627 N.E.2d 49, 1993 Ill.App. LEXIS 1540 (1st Dist.1993), which plaintiff cites in support of this proposition, held that a person cannot adjudicate a claim if he is affiliated with any party in interest. As previously noted, Congress rejected this common law principle when it enacted § 1108(c)(3) of ERISA, which provides that nothing in the Act prohibits any officer of the party in interest (company) from serving as a fiduciary of the company's ERISA plan.

The court finds that Montgomery and Penzkover did not have a conflict of interest by reason of their reviewing Douglas Ralston's decision to deny Chalmers severance benefits. Plaintiff contends that both Montgomery and Penzkover were subordinates of Ralston and were therefore afraid to tell him that he had made a mistake in denying Chalmers severance benefits. The evidence revealed that both Ralston and Montgomery are vice presidents and peers, but that Ralston technically outranks him as a senior vice president. The testimony showed that Ralston does not evaluate Montgomery, has no daily supervisory authority over Montgomery and has no input into his compensation. Ralston and Montgomery have parallel responsibility for human resources in different groups within Quaker—Corporate Human Resources and Human Resources U.S. Grocery Products. They are in different chains of command and routinely consult each other

for advice and to coordinate matters between their groups.

The testimony revealed that Penzkover is a subordinate of Ralston. However, no evidence was elicited to show that Penzkover was anything but independent and strongminded in evaluating the evidence and issues relating to Chalmers' appeal. The evidence established that Penzkover had disagreed with Ralston in the past and had never suffered any adverse consequences or been led to believe that any adverse consequences might result from such disagreements. The evidence established that both Montgomery and Penzkover are both accustomed to dealing with senior officers on a daily basis and to expressing their views without fear of retaliation. According to the testimony, Quaker's corporate culture encourages employees to express their views and to question others' opinions, regardless of rank. This attitude is especially predominant in Human Resources given the department's role in asking difficult questions and taking unpopular positions regarding other department's employment and business decisions.

Given the corporate culture, Montgomery's and Penzkover's personalities and their training in the Human Resources Department, the court was left with the strong impression of the Committee's independence. The testimony confirmed that Montgomery and Penzkover do not hesitate to aggressively advocate their respective views on corporate matters—even if that might mean disagreeing with the company's highest ranking officers.

Plaintiff makes much of the fact that Ralston briefly discussed Chalmers' situation with Montgomery during the course of his investigation into the Raisor incident and that Montgomery responded by stating that Ralston would probably have to decide that Chalmers should be terminated and his severance benefits denied based upon the reported facts. The record is clear that this conversation was consistent with Ralston's and Montgomery's practice of discussing such issues in an attempt to uniformly apply human resources policies in their groups. The conversation was also consistent with their role as members of the Severance Pro-

**1160**

gram Committee. Pursuant to § 2(b) of the Program, Ralston and Montgomery devised a practice whereby the Committee member for the involved group (Corporate or U.S. Grocery Products) would make the initial decision to award or deny severance benefits. The full committee would then review any appeal. Ralston was merely conferring with Montgomery to determine whether and how he had dealt with any similar incidents of sexual harassment in the past. There was no premeditated attempt on Ralston's part to improperly influence Montgomery.

█ Whether Montgomery and Penzkover knew Chalmers or had some knowledge of the incidents surrounding his termination prior to deciding his appeal is irrelevant to the conflict of interest issue. By allowing a company to appoint its own officers to administer an ERISA plan, Congress appears to have recognized that plan administrators will likely have some knowledge of the employees and employment decisions at issue.

What is important is that there was no evidence that Ralston had any contact with Montgomery or Penzkover concerning Chalmers' appeal once he recused himself from the Committee. There was also no evidence that Ralston communicated in any way to Montgomery and Penzkover that he might be upset if his initial decision denying Chalmers' severance benefits was reversed by the Committee. The court further finds no evidence to show that Montgomery and Penzkover were improperly biased by any communications with Ralston prior to the appeal.

█ The court also finds that Quaker was not a fiduciary under ERISA merely because its Law Department determined what documents should be provided to the Committee. ERISA defines a fiduciary as follows:

[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets ... or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A). The Seventh Circuit has held that in order to have the requisite discretionary authority, control or responsibility to be a fiduciary under ERISA, a person must have actual decision-making power to award or deny benefits under the plan. *Pappas v. Buck Consultants, Inc.,* 923 F.2d 531, 535 (7th Cir.1991). The ability to influence a decision concerning benefits by providing advice or information does not create fiduciary status. *Pappas* at 535. Under this test, Quaker's Law Department was not acting in any fiduciary capacity within the meaning of ERISA when it failed to provide the Committee with plaintiff's exhibits 10 and 50. Defendants' motion in limine to bar plaintiff's exhibits 10 and 50 is granted.

█ Even if Quaker was an ERISA fiduciary and exhibits 10 and 50 were admitted into evidence, no breach of fiduciary duty occurred as Quaker's failure to turn over the documents was inadvertent. Ralston credibly testified that he did not think to turn over his notes of the termination conference with Chalmers to the Law Department. Ralston promptly turned over all notes taken during the course of his investigation; he did not consider the termination conference to be investigatory. In fact, there was no attempt to hide this evidence from Chalmers as the subject matter of Ralston's notes should have been known to Chalmers as he was present at the conference. Green also credibly testified that she did not turn over the notes of her September 2, 1992 meeting with Raisor because the purpose of her meeting was not investigative in nature but instead to offer support and counseling services to Raisor. The court ascribes no ill motives to Ralston or Green for not including their notes in the investigative file maintained by the Law Department.

Furthermore, the court also found credible Montgomery's and Penzkover's testimony that had they been given plaintiff's exhibits 10 and 50, the information contained therein would not have favorably affected their decision. For example, Ralston's notes reference both the Raisor incident and "the Brady situation (creation of offensive and intimidating environment)" as grounds for Quaker's decision to terminate Chalmers. (Plaintiff's

Exhibit 10). Green's notes are likewise damaging: "Raisor has heard [Chalmers] say negative things to women over time. For example, 'liked it better when you guys were in the kitchen.'" The notes also state that Raisor did not want to see Chalmers and that Chalmers was avoiding her as well. (Plaintiff's Exhibit 50).

Because the court determined that Quaker was not an ERISA fiduciary and therefore no fiduciary duty was breached, it need not determine whether the inclusion of the Kolinski incident amounted to a deceptive bolstering of the record. In any event, the court does not perceive the Committee's reference to the Kolinski incident in the denial letter as indicative of the Committee's bad faith. If anything, it shows a natural desire by the members of the Committee to demonstrate to Chalmers that their decision was not arbitrary or unfounded.

■ Because there was no significant conflict of interest, the court must accord the Committee's findings and Program interpretations great deference. The court finds that the administrative record provides a rational basis for the Committee's finding that plaintiff violated Quaker's policy against sexual harassment and that his conduct constituted "gross misconduct" under the Program. The Committee considered the relevant evidence and issues; its factual findings and interpretation of program provisions were reasonable—certainly not completely unreasonable.

Quaker's policy against sexual harassment defines sexual harassment in part to include unwelcome sexual advances or verbal or physical conduct of a sexual nature which interferes with work performance or creates an offensive environment. A policy handout also explicitly provides that "in addition to physical or other explicit sexual conduct or language, our policy covers jokes of a sexual nature, 'pin-ups', sexual stories, etc." Distinct from federal law which applies a reasonable person standard, Quaker interprets its policy to apply a subjective person standard. Under Quaker's policy, whether conduct is sexually oriented or offensive is judged primarily by the subjective perception of the listener or recipient. The reaction of the listener or recipient is conclusive unless it was totally unreasonable in light of all the circumstances, regardless of how an average person would likely have reacted.

Evidence in the record supports the Committee's finding that Ralston had a good faith basis to terminate plaintiff's employment for violation of Quaker's sexual harassment policy. The record indicates that Chalmers made several sexually offensive comments to Karen Brady and other women in 1987–88 and created an environment of fear in his department. Ralston's notes from the 1988 investigation revealed a strong fear of reprisal in the Tax Department. Ralston discovered that many women were afraid to complain about sexual harassment because Chalmers did not take the issue seriously and because they feared retaliation from him even if the complaints did not involve him. Plaintiff's secretary, Cathy Abrahamian, reported that many women were offended by Chalmers but were afraid to say anything for fear of their jobs.

Plaintiff reportedly expressed severe displeasure with Dan Orzechowski for helping a woman report an incident of sexual harassment. Orzechowski interpreted Chalmers' conduct as a clear warning and was afraid to help another woman report a subsequent incident. Ralston was sworn to secrecy by several individuals who were convinced that Chalmers would retaliate if he knew they were discussing Chalmers' conduct with him. Karen Brady asked Ralston not to confront Chalmers with her allegations until after she had left Quaker. After investigating Brady's allegations against Chalmers, Quaker paid her $30,000 to settle her threatened sexual harassment suit.

Evidence in the record also supports the Committee's finding that Chalmers again violated Quaker's policy against sexual harassment in 1992 when he kissed Anna Raisor. This occurred even though he had been warned about future disciplinary action and had been required to attend sexual harassment training seminars after the 1987–88 incidents. Evidence supports the finding that the kiss was sexually oriented conduct within the meaning of Quaker's sexual harassment policy. Raisor was clearly shocked, repulsed and offended by the kiss.

It is unlikely that Chalmers would have kissed a man as a gesture of appreciation for his assistance in typing reports or as an apology for an earlier loss of temper. Plaintiff kissed Raisor, an employee of the opposite sex, in a business setting where a kiss was not customary or appropriate and where she had done nothing to indicate that a kiss was welcome. The incident also showed a lack of respect and concern for her feelings and could be interpreted as a show of power over her in the context of a male-female or employer-employee relationship. The kiss also came from an individual with a history of engaging in potentially offensive physical conduct such as the incident where he carried Lisa Kelly onto the dance floor and the recent incident where plaintiff took Nancy Kolinski's hand and informed her that a warm hand means a warm heart. Chalmers' reported response to Steve Vranek, "Yes, but I didn't touch anyone," shows that plaintiff himself recognized that physical contact escalates the harassment.

The Committee concluded that these incidents of sexual harassment constituted "gross misconduct" under the Program. The Committee considered Chalmers entire history of sexual harassment, the fact that he had violated Quaker policy and created a hostile environment in his department, had received training to educate him regarding sexual harassment, had been warned to avoid repeat violations, but had nevertheless committed another offense which involved physical contact. The record supports the Committee's finding that the repeat incident was a willful or at least a reckless violation of Quaker's policy.

In making this determination, the Committee examined the application of the "gross misconduct" standard in other cases. Although this was the first case where an officer was discharged for sexual harassment, Quaker had previously discharged regular (non-officer) employees for violations of Quaker's sexual harassment policy. These cases were treated as terminations for gross misconduct and severance benefits were denied. Montgomery personally made many of these decisions to deny benefits. Officers discharged for theft had also been denied

severance benefits under the gross misconduct provision of the Program. In this case, the Committee concluded that a violation of Quaker's sexual harassment policy was no less serious an offense than theft.

Chalmers contends that the Anna Raisor incident was the only conduct relevant to the Committee's consideration and that the prior investigation and legal settlement of Karen Brady's threatened sexual harassment suit should not have been considered by the Committee as it was too remote in time. Chalmers offers no authority for the proposition that Quaker must impose a rule of limitation on prior acts of sexual harassment in enforcing either its sexual harassment policy or in determining benefits under the Program. Plaintiff's argument, that the Committee should have determined whether the Raisor incident alone constituted gross misconduct, is one conceivable perspective but it does not make it *unreasonable* for the Committee to have considered all the circumstances preceding the Raisor incident in making its determination.

Chalmers' appeal letter did not dispute the truth of most of the facts reported in Ralston's 1988 notes and did not dispute Ralston's conclusions from the 1988 investigation. Even after the Committee's denial letter set forth this evidence and offered Chalmers a chance to respond or supplement his November 6, 1992 appeal letter, he chose not to present any additional evidence to the Committee thereby failing to avail himself of the opportunity to supplement the administrative record for appeal.

Based on the facts set forth in the record, the court determines that the Committee's analysis of these facts was reasonable and that the Committee's material factual findings were rationally connected to the evidence in the record. The court also determines that the Committee's interpretation of Program provisions and Quaker's sexual harassment policy was also reasonable.

Accordingly, the Committee's decision to deny plaintiff severance benefits under the Quaker Officers' Severance Program is affirmed. Judgment is entered for defendants, The Quaker Oats Company, Quaker Officers' Severance Program, Robert Penzkover and

Robert Montgomery as Members of the Severance Program Committee, and against plaintiff, Leland R. Chalmers.

ORDERED: The Severance Program Committee's decision to deny plaintiff severance benefits under the Quaker Officers' Severance Program is affirmed. The Clerk is ordered to enter judgment for defendants, The Quaker Oats Company, Quaker Officers' Severance Program, Robert Penzkover and Robert Montgomery as Members of the Severance Program Committee, and against plaintiff, Leland R. Chalmers, on a separate document pursuant to Federal Rule of Civil Procedure 58.